Good morning, Your Honors. My name is Greg Mitchell. I'm here on behalf of the National Association of Business Trust, the Liquidator, which is a state court insolvency proceeding. This matter concerns Section 523A4, Discharge Proceeding. This is an appeal by us, the Liquidator, with regard to the overturning of findings of facts and conclusions in order of a bankruptcy court in Arizona finding that the debt in question was non-dischargeable in the bankruptcy proceeding. So your client is the Commissioner of Insurance for Kentucky who has been appointed as a Liquidator, is that correct? Yes, that's correct, Your Honor. It's a state court insurance liquidation proceeding under state court insurance insolvency matters. The Commissioner in that capacity acts as the Liquidator as appointed by the statutory reference. It's a separate scheme outside of the bankruptcy code dealing specifically with insurers, and in this case even more so, which is how important this case is, is it's an unauthorized insurer. Mr. Mitchell, if we can sort of get right to the heart of it here, the Franklin County Circuit Court made a factual finding that NBAT and NBA were one and the same entity. Yes, sir. I read that as being the alter ego, pierce the veil, whatever you want to call it. It's just one organization, is that right? Yes, sir. And then on top of that we have the fact that Mr. Glogower did not bother to comply with any of the insurance regulations of the state of Kentucky, so he wasn't even a legitimate insurance company when he opened for business. That's correct. Okay. So the question is, what is the effect of that factual finding on United States bankruptcy and district courts in the District of Arizona? Do they have to give full faith and credit to that factual finding as to the issue of being one and the same for purposes of assessing fiduciary obligations under ERISA? Have I got this right? Yes, sir, absolutely. We believe absolutely, because in this case, and obviously it's very difficult in the context of unauthorized insurers where they set up a third-party administrator and then you have a trust fund, in this case it was a specific and express trust. The Franklin Circuit Court, following off the lines of federal court proceeding where the third-party administrator, Mr. Glogower, had tried to say that state regulation didn't apply because of ERISA, so it's got a convoluted history. But once that was found, the Franklin Circuit Court determined that this was one entity. And to be the one entity, it was an unauthorized insurance multiple employer welfare arrangement, subject to ERISA and therefore all of the fiduciary duties. Who employed Mr. Glogower? Who employed Mr. Glogower? What entity employed him? Well, prior to the determination that this was one and the same entity, he would have been the president, CEO, director, officer of a national business, NBA as they refer to it. And who worked for NBAT? No one, Your Honor. How did it operate then if nobody worked for it? Because it was all, as Judge Graham found in the Franklin Circuit Court order and as Judge Baum found after trial on the 523A discharge, that NBAT was totally controlled and run by NBA, Mr. Glogower. This may be irrelevant, but I'm just interested in how your liquidation proceeding operates. Who are the claimants? You're obviously in the business of marshalling as many assets as you can, and then you're going to pay them out. Who are your claimants that would be entitled to pay out? In an insurance insolvency proceeding, most states have the model law which Kentucky has. In that regard, the liquidator is supervised by one court in Kentucky. It's the Franklin Circuit Court, handles all liquidation matters. And in that regard, the liquidator has duties to collect the assets and to also in this regard to prosecute the claims not only on behalf of the entity of which they are liquidating, different from a bankruptcy proceeding, but also for all the claimants, creditors, and more importantly, the policyholders. The whole essence of the liquidation proceeding is the policyholders. I should have been more specific in my question. I understand that in the abstract. Who are the claimants in this proceeding, in this liquidation proceeding? In which proceeding? The liquidation proceeding that you're presiding over. The claimants are the planned beneficiaries who thought they had health insurance, and their health insurance benefits were not paid. There were next to no creditors in the state in the sense of a general creditor that didn't have their rent paid. So the primary claimants here, Your Honor, are the claimants that had a plan of what they thought was insurance for their health care, and as they found out, their claims were being held, and at the end of the day, millions of dollars of claims were not paid. And is it turning out that they're on the hook for this, or is it the medical care providers that are suffering? Do we know this? It runs the gamut, Your Honor, based on some other statutory provisions. In some cases, the providers have to step in. In most cases, it's the employees. I mean, there are, it's not in the record, but some very bad situations. Isn't there a fund in the state of Kentucky to pay the claims when an insurance company goes out of business? Had there been, had this entity have been set up as it should have been and properly regulated by the state insurance department, ERISA would apply, but only to the extent that the insurance laws didn't conflict with ERISA. The primary would be that you maintain reserves, which were to be actually justified so that the contributions being made would be sufficient to pay the benefits as they became due. No, no, no. I understand all that. I'm following up on Judge Fletcher's question, and this is probably based on my experience here in California, but California has a fund that the state maintains through the Commissioner of Insurance so that when an insurance company goes bankrupt, if there are unpaid claims, money is paid out of that fund to make sure that the beneficiaries get their medical bills paid. And I probably was trying to respond to a long way to get to the answer, which is because this entity was unauthorized. They were not subject to, in Kentucky it would be the Kentucky Insurance Guarantee Association. So the claimants weren't paid out of that fund? That's correct. Had this entity been set up and complied with applicable law, they would have become authorized, therefore then the guarantee fund would have attached, and had there been a failure, there would have been a fallback position with the Guarantee Association to pay the claimants. Well, that's interesting. Now, Judge Nelson, sorry. Sorry, Judge Fletcher. Go ahead. No, no. I was going to make an extraneous and irrelevant comment. Let's assume that NBAP and NBA are a single entity. Isn't the real issue whether or not the payments were made out of the trust funds? If the liquidator had, what, 20 percent for the trust? Are you claiming he was a fiduciary with respect to those administrative expenses as well as the other 80 percent? Yes, ma'am. We claim that he was a fiduciary, whether the order found that NBA and NBAK were one and the same, but because they were one and the same, clearly all of those funds were trust funds of which he had a fiduciary responsibility. But given that there still was a distinction that caused much confusion of this separate agreement, nevertheless, NBA was, as a plan administrator and the plan supervisor under ERISA, had a fiduciary duty. Many cases find that you don't have to look simply to that, and Judge Baum in his findings found Mr. Glogar had sole control over that. So all of the funds would come into the NBAT account, of which then Mr. Glogar had the sole ability to determine when and whether to pay NBA, which then allowed him to pay himself. Well, the funds that went to NBA were supposed to get 20 percent. I mean, that was the deal for their administration. That was the agreement that was set between him and the executive director. Is there any showing or finding in this case that NBA got more than 20 percent? No, sir. There's no showing that they got more than 20 percent. And is there any showing that the money that came to Mr. Glogar came from any other source than from NBA? No, sir. I don't believe so. What do you do then with what I think is, we have a fairly strict definition under this dischargeability rule as to what constitutes the trust? I'm following up on Judge Nelson's question, obviously. Well, I take it that the law, and obviously we've not found any case that's directly on which now has been determined by the insolvency court to be one and the same entity. To me, it's an express trust. And if you don't consider it to be an express trust under ERISA, many cases would find that it's a technical trust because ERISA says, and the findings would reflect, that NBA and Mr. Glogar had the discretion and controlled all of the aspects of the NBATV express trust. But is there any evidence that the claims account and the administrative account were not completely separate? Is there any evidence that they were not completely separate? This goes back to Judge Fletcher's question, were they part of the trust? Yes, ma'am. They were completely separate, were they not? 20 percent was set aside? From the record, it would be clear that the NBAT funds, all of the employees, the employers paid money, they went into the one general NBAT account for the express trust. And so is there any evidence that these loan payments and bonus payments, which from my perspective were outrageous, but is there any evidence that they came from the claims account as opposed to the administrative account? What Judge Baum found, Your Honor, would be that Mr. Glogar had the ability to control the movement of funds in whether you consider this one entity or two separate entities, the funds that came from these claimants, he had the sole ability and control when and where they were paid. Yes, it's true that the money, what do you want to call it, laundered, was funneled, it came through a separate account, he controlled paying of the check, went to another check, and to which he paid himself. Isn't your theory that it doesn't matter that the money was split into two accounts, if they were one and the same entity, they could have offshore accounts in the Bahamas or an account in a Swiss bank, because of the fact that all the money came into one entity, that's the race of the ERISA trust, and whatever Mr. Glogar did with that money, he acted as an ERISA fiduciary, so that when he decided to pay the money to himself in the form of bonuses and loan payments, that was a breach of his duties as a fiduciary of the single entity ERISA trust? Yes, Your Honor, that's exactly right. Well, what happened to all that, I mean, why did this go bust, that is to say, what happened to the money that was supposed to be the 80% that NBAT was in control of and was supposed to then be using to pay out? As Judge Johnstone in the Western District of Kentucky case found, as the Kentucky court, Judge Graham found in 1995, as Judge Baum found, that from the beginning, notwithstanding what is in the plan agreement and the plan documents given to each of the claimants that thought they had health insurance, that this fund was supposed to be underwritten and the contributions to be based on the actuary, just like an insurance company, that's what ERISA would require, notwithstanding those duties and obligations. No, I got that part. I'm asking what happened to all that 80% money? It was, this was a Ponzi scheme, Your Honor, it was cash flow. Simply, you paid your premium out, and based on that premium, they would pay the next person's claims until the money ran out. As Judge Baum in his order and specific findings we put in our briefs reflect, almost from the very beginning, there was a deficit, because they did not establish reserves. It would be you sell a new insurance, and I simply take your premium, and I don't set any aside knowing that maybe next week you're going to go to the doctor's office and I'm going to have to pay a claim. Was the underlying problem, then, that the premiums simply weren't high enough to sustain the level of payout required under the terms of the agreement? Yes, sir, that would be one of the things, yes, sir, which the plan supervisor, NDA, was required to do. Is there any showing or finding of theft by Glogauer? No, sir. No, no, no. So a Ponzi scheme usually... And that $17 million was out of that so-called 20%? Yes, sir. I got it. Okay. It grew quickly, and it fell quickly, and we're dealing with a mess. Okay. Good morning. Kathy Sanweiss for Applely. Andrew Glogauer. It's very tempting, and I see where the court is going on this, it is very tempting to want to hold my client liable because claims were unpaid, and we're talking about insurance companies, and we're talking about health care insurance, but... The question is, if this was a single entity, and ERISA applies, then Mr. Glogauer had to conduct the business of this ERISA insurance fund in such a way that he did not engage in a defalcation. And the case law seems clear to me that where a trustee chooses to pay himself rather than the claims of the beneficiaries, he has defalcated under the law without regard to whether or not Mr. Glogauer is a good person, a bad person, he has breached a fiduciary duty, and the law holds him personally liable. What's wrong with my analysis? This emphasis on one entity. One entity, one company can have two bank accounts, two pockets. We do this in law firms all the time. But if you dip into the client trust fund, you've got a problem, and the question is whether or not the two accounts constituted the race of the trust, or whether it was just the 80%. And what do you do with the finding that it was all one and the same? That's exactly correct, Your Honor. If there was any evidence that Mr. Glogauer dipped into the 80%, then we wouldn't be here now. But that's not the question. The 100% of the money went into the NBAT, I'll call it the express trust account, first. And Mr. Glogauer had to authorize payment out of that 100 cents on the dollar to 20 cents to go to NBA. And the question is, as an ERISA fiduciary, can he do that at a time when he knows that there's not enough money out of the 80% account to pay the outstanding claims that are pending but not payable because he doesn't have enough money to pay them? Well, that was the party's agreement, the specific plan agreement provided for 80% to be paid for administrative expenses. There was no contingency plan for what if there wasn't going to be enough. That was the agreement. Let's just stick with the 80% account. If I am an ERISA fiduciary over that fund and I know that there's not enough money in that account to pay outstanding claims, I can't use that money for any other purpose, can I? The 80%, correct. I can't use it to pay the light bill, I can't use it to pay the landlord for the rent on my office space, I can't use it to pay my salary. I have to authorize payment for these claims. That's my fiduciary duty. That's correct. And there's no evidence that the janitor or the light bulbs or the employees were paid out of the 80%. The evidence is absolutely clear that it was paid out of the 20%. If he decides, knowing that situation exists, to pay the money over into the NBA account so that he can then pay the janitors, the light bill and himself, why isn't that a breach of his fiduciary obligation? Because that's not the standard. The Hemeter case really addresses this, and it's interesting because actually the Hemeter case is a Ninth Circuit case, and it actually says that holding simply that staff can't be paid out of the 80%. The statutory ERISA fiduciaries qualify as fiduciaries under Section 523A4 does not end our inquiry. And that's because it's a two-step process. There has to be a trust rest as well as a fiduciary obligation. It's not a fiduciary obligation in the air. And this Court and the Sixth Circuit have been very clear that fiduciary obligations are much more narrow under Section 523A4. There has to be a trust rest. And here's the important part that I think we haven't addressed today, and that's that the trust rest has to be preexisting prior to any wrongdoing. And that's the Cantrell case. And that's important because what we do... The 80%, 20% was created, but the wrongdoing... You say 80%. A trust was created, and in the trust documents there is a provision that permits the payment of a 20%, I'll call it administrative fee, right? But the money still has to go into that trust before the administrative fee is paid out of it. But then there's no one to administer the trust. Well, the Franklin County Circuit Court found that there was certainly someone to administer it, and that happened to be the plan trustee, Mr. Glowgower, one and the same person. But that finding was made many years later. It was made after the payment was made to the 20% trust, and certainly long after these bonus and loan payments were made out of the 20% trust. There's no evidence of misappropriation of the funds in the 80%, and without a plan administrator, without a plea... Counsel, it's not a misappropriation. Nobody's accusing Mr. Glowgower of theft. He's accused of breach of his fiduciary duty. It's called a defalcation in the law, and that is not misappropriation or theft. It's simply an improper use of trust money to pay a non-claim use. That's right. But the trust, the express trust has to exist before the wrongdoing, and I know Your Honor is saying, but it did. The 80%, 20% existed. The 20% was always Mr. Glowgower's money. It was never trust money. And so what we're trying to do here, what the liquidator is trying to do and what the court is talking about doing is imposing there's some sense in the air of there was wrongdoing, the plan failed, there wasn't enough money to pay the claims out of the 80%. Well, that in part is a breach of the fiduciary duty, is it not? The failure to properly underwrite the insurance risk so that you collect sufficient premiums from the employers to see to it that all of the anticipated claims will be paid. Mr. Glowgower breached his fiduciary obligation in that regard as well, did he not? That's not the standard, though, under Section 523. That may or may not be a standard of breach of fiduciary duty, and it may have been a breach under the unauthorized insurance laws. But remember, this is not a Kentucky state law case. We're just talking about the specific requirements under Section 523. And so whether or not there was a breach as to whether Mr. Glowgower should or should not have asked the claimants for more money to be paid in higher premiums, maybe he should have. But that's not an issue that was tried in this case. Well, one of the things that he didn't do was he didn't tell the trustees of the ERISA plan that there was not enough money to pay the claims, and that's another breach of fiduciary duty, is it not? No, Your Honor. With all due respect, first of all, that issue was not preserved in the joint pretrial statement, and that's important because there was not evidence in the record as to that. Mr. Glowgower was questioned, and the questioning was something like, isn't it true that you didn't notify the trustees? And Mr. Glowgower responded, no, that's not true. I thought he said, no, I don't know that that wasn't done. He said that in one part of the record as well, Your Honor. And so there's no evidence that he did or did not notify the trustees. What he did testify to was that at a particular meeting he advised trustees to consult with their attorneys because he didn't have direct communications with them. But, see, this was not an issue that was fully developed at trial. The record shows that there would have been 500 boxes taken into custody by the Kentucky Department of Insurance, which either would or would not have potentially addressed that issue, but it wasn't an issue addressed at trial. And trial counsel objected vigorously to any expansion of issues beyond what was addressed in the joint pretrial statement. So the issue wasn't addressed. There wasn't evidence that Mr. Glowgower did or did not specifically advise them. And back to your 80-20 theory, is it your position that throughout the three-year course of the operation of this business, that the NBA was entitled to 20 percent of the funds at every point in time throughout, even at that point in time, let's say two years ago? And that was the case for the first three years into the operation, where Mr. Glowgower clearly knew that there were an insufficient amount of money in the trust fund to pay the claims. We have that chart that was admitted as evidence showing the amount of checks that were written and the amount of checks that were held. And the amount of checks that were written is far larger than the amount that was held. So it looked to me like there were efforts being made to sort of float the beneficiary claim checks, and the amount of checks that were held was far larger than the amount that was held. And the amount of checks in order to meet the cash flow problems. Is it your position that even at that point in time it was okay for Mr. Glowgower to authorize 20 percent be paid to NBA, knowing full well that there wasn't enough money? I guess it's not my position that it was or wasn't appropriate, because, again, that goes back to sort of this general sense of what's a breach of fiduciary duty under common law, under ERISA. But we're only talking about what the Ninth Circuit and the Sixth Circuit has said is defalcation under Section 523. But it seems to me what you've done is you've turned ERISA on its head. You have made the payment of the administrator for the administration of the plan the highest priority of the ERISA fiduciary, even if it means that the poor claimants who are trying to get their medical bills paid go without. And that cannot be ERISA fiduciary law. That just can't be the law. But, again, Your Honor, that's an ERISA fiduciary, and the Hemeter case says that holding ERISA fiduciaries qualifies fiduciaries does not end the inquiry. The definition of defalcation, and this is under Section 523A.4 in the Hemeter case, the definition of defalcation includes both the misappropriation of trust funds held in fiduciary capacity and the failure to properly account for such funds. And then you combine that with the Cantrell case, which is also a Ninth Circuit case, that says that the existence of the trust funds, the trust rest, must exist before the wrongdoing. And so in this case, you've got this 20 percent that's carved out. That's the agreement of the parties. It gets paid no matter what. It gets paid. It's Mr. Glowgower's money. Even though the premiums are collected regularly over the three-year period, and even though Glowgower knows there's not enough money in the race to pay the claims, NBA still gets its 20 percent first. And there's nothing wrong with that under 523A.4. That's correct. Otherwise, it would be asking this company to make a donation. Let me ask you this. Over the period of this, characterized by your adversary, Ponzi scheme, what was Mr. Glowgower's total salary during this period, coming out of NBA? I don't know that that's in the record, and there certainly is nothing in the record as to it being a, quote-unquote, Ponzi scheme. There's no finding of a Ponzi scheme. I'll retract calling it a Ponzi scheme. I made it clear I was using his word. Right, and I did hear Mr. I'll call it debacle. During this debacle. How much was Mr. Glowgower paid in salary total? I don't know that it's in the record, Your Honor, as to how much he was paid in total, but he had his salary deferred. Remember what these I understand that. I mean, that's what we're dealing with is payments of what are purported to be deferred salary. Let me ask you this question, then. Over the period of this debacle, how much did the 20 percent amount to? I believe there's a record that it amounted to $11 million, but that's 20 percent of the total amount. And again, it's not the standard whether or not Mr. Glowgower did or did not take his 20 percent, because Okay. Now, do you know how many employees were in the NBA operation? I believe there were about a half a dozen that testified in the trial. And how long a period are we talking about for this? You're saying it's $11 million? Right. Approximately a six or eight year time period. I'm seeing you shaking your head. You'll get a chance to say something about this. And Mr. Glowgower is now in bankruptcy, correct? Well, correct. This arose out of a bankruptcy. That's correct. He's not in bankruptcy now? Well, I mean, he – procedurally, the bankruptcy court denied the discharge as to the bonus payments and the loan payments, and granted a discharge as to the total amount of the unpaid claims. The district court then affirmed the – denied the total amount of the unpaid claims. And granted a grant of discharge as to the unpaid claims and reversed as to the denial of discharge. And that then finishes the bankruptcy, assuming we leave it alone? Correct. Now, this is maybe outside the record. What do you do with all the money? Why is he in bankruptcy? That's a lot of money. And even though we don't know exactly how much he was paid, I'll tell you, federal judges get along on a lot less money than that, and we tend not to declare bankruptcy. I would just say that, you know, this court in the Sixth Circuit has really – has adopted a very specific, narrow definition. So you don't know the answer? You don't want to tell me? What do you do with all the money? I don't know what he did with the money. I'm not paid to know what clients do with the money. Counsel, I'm looking at Judge Johnstone's memorandum opinion published at 770-F-SUP at page, looks like, 1171. And he says, purportedly, during the 32-month period in which it served as administrator slash plan supervisor for NBAT, NBA received over $17 million in fees. So is it 17 rather than 11 million? I'm sorry. Where was that in the record? That would be 770-F-SUP at page 1171, Judge Johnstone from the Western District of Kentucky, in his memorandum decision and order in NBAT v. Morgan. I see. If that's what Judge Johnstone said, then perhaps that is correct. But again – So six employees, 32 months, 17 million in fees. Thank you, Counsel. Your time is up, but if you want to do a paragraph or two, you want to sum up, please feel free. Yes, Your Honor. I would just say that this Court in the Sixth Circuit has set a very specific standard as to what constitutes defalcation in a fiduciary capacity. That standard does require that there be an express trust, rest, and that any misappropriation of funds from the federal government, funds come out of that trust rest before there be deemed a nondischargeability under Section 523. And that was not the standard that the bankruptcy judge applied. It was the correct standard applied by the district court judge, and I would ask that the Court affirm the district court. Thank you. Okay. Thank you. Mr. Mitchell. The 11 million that was referred to was the amount of outstanding claims that were presented that had been unpaid. I'm sorry, you're going to have to speak up a little bit. I'm sorry. The 11 million that was just referred to, that was the amount presented of the outstanding claims that were presented to Judge Baum. Judge Baum specifically found that all contributions would be held in trust under the terms of the agreement. And with respect to the defalcation, Judge Baum found that Glogower decided to pay himself when he was fully aware that the entities, NBAT, NBA, he controlled, could not pay the claim to do the plan beneficiary. Is there anything in the record from which we can determine whether, not whether these last payments were excessive under the circumstances, but rather whether 20 percent was an excessive amount to be paid for administration in a non-fiduciary capacity? Had this been a bona fide insurance scheme? No, sir, that issue wasn't tried. Judge Baum, in his outline of the amount of claims and the amount of the 20 percent NBA received is in Judge Baum's minute entry order, which lays out as the progression at the time these payments were made that Glogower continued to pay himself, notwithstanding that the claimants continued. Yes, I understand that, but the legal point that your adversary relies on, and that was the determinative legal point in the mind of the district judge here, however, is that NBA was entitled to this 20 percent, and that even though the 80 percent wasn't proving sufficient to pay off the claims, nonetheless, that was a separated fund. So I'm trying to figure out if there's some other way to skin this cat, which is why I ask whether the 20 percent was excessive, and we just don't know that answer. That issue wasn't tried. What was is that all of the NBAT funds went into an account, and at that point in time, Mr. Glogower had the ability to pay himself or not pay himself and use the 100 percent to pay the claimants, of which he chose all through that period when he had knowledge that the claimants weren't being paid and the money continued to occur. And he continued to hold checks. Judge Baum specifically found that he violated his fiduciary duty of disclosure when he failed to adequately inform the beneficiaries and employees of the severe financial distress of NBAT. That's the point, Your Honor, the fact that he was entitled to the 20 percent as an administrative fee. And just to trace the money flow, so the money goes into the entire 100 percent goes to NBAT. Yes, sir. And then NBAT pays 20 percent to NBA. But NBAT controlled NBAT and totally had total control of the access to the funds. I just want to make sure I got it right, because you answered it thinking I know more than I do. All of the payments come into NBAT as an initial matter. Which NBAT was NBA. It was there physically. Yes, they had signature cards, but the signature cards for that account in the name of NBAT were all people of NBAT. They controlled that account. The money went in, but they controlled. I understand. That's not my question. All of the initial premiums are paid to NBAT. Is that correct? Yes, sir. And then NBAT is paid by checks written on that account. That account is an NBAT check. Yes, sir. So that 20 percent comes out of, it always comes out of the trust account. Absolutely. Yes, sir. And that's what we judge by. I'd like to ask one question. I don't know if my music is gone, but you have a very sympathetic case in my opinion. What do you do with the Ninth Circuit Hemmeter case? The Hemmeter case, which seems to say you need an express trust. Yes, sir. We think Hemmeter stands for the proposition that there is an express trust here. It's National Business Association trust. It is an express trust. But as Hemmeter found under ERISA, irrespective of where we were, corporation or other, it's a technical trust, of which NBA had fiduciary duties to that trust. So the rez in this question is this NBAT account with 100 percent of the contributions that went into. All right. Thank you. Thank you both of you for your helpful argument.
judges: Nelson, Fletcher, Tallman